IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


MICHAEL S. GRIFFIS                                                        PLAINTIFF


            v.                          Civil No. 05-3040


SHERIFF CHUCK MEDFORD;
LT. BETH REELY; JIMMY
KEELAND; MICHAEL BROWN;
PETE MOSS; JACK GENTRY;
MARK LOTTA; DR. THERESA FARROW;
DR. DONALD CLAY; SHELIA M.
HOWERTON; and REGINA FOX JEFFREY                                       DEFENDANTS


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.

Griffis is currently incarcerated at the Arkansas Department of Correction.  This case concerns events that occurred while Griffis was incarcerated in the Carroll County Jail.

Separate defendants Dr. Theresa Farrow and Dr. Donald Clay filed a summary judgment motion (Doc. 84).  To assist Griffis in responding to the summary judgment motion, a questionnaire was propounded (Doc. 141) by the court.  Griffis filed a timely response to the questionnaire and also filed a handwritten response objecting to the form and content of the questions propounded by the court (Doc. 151).  The summary judgment motion is before the undersigned for issuance of this report and recommendation.

-1-

AO72A
(Rev. 8/82)

## I.  Background

Griffis was treated as an outpatient at the Ozark Guidance Center (OGC), a community mental health center located in Springdale, Arkansas, in 1995 and 1996 and then resumed outpatient treatment at that facility in 2002. *Affidavit of Dr. Clay at* ¶ 3 (*hereinafter Clay's Aff.*). Griffis was a private patient at OGC. *Id.*[1]

At all times relevant to the complaint, Dr. Theresa Farrow and Dr. Donald Clay were employed as salaried psychiatrists by OGC. *Clay's Aff. at* ¶ 1; *Affidavit of Dr. Farrow at* ¶ 1 (*hereafter Farrow's Aff.).* By affidavit, defendants assert that neither were employed by the State of Arkansas or Carroll County or any department or division of the State or any of its counties at any time relevant to this case. *Clay's Aff. at* ¶ 4. They also assert that neither ever contracted with the State of Arkansas or Carroll County or any department or division of the State or any of its counties for the furnishing of medical or psychiatric services. *Id.*

Dr. Clay indicates that after Griffis became incarcerated at the Carroll County Jail he did from time to time treat Griffis. *Clay's Aff. at* ¶ 7. Dr. Clay states he was not paid or compensated in anyway by the State of Arkansas or Carroll County, or any department or division of the State of Arkansas, or one of its counties, for any medical or psychiatric services he provided to Griffis. *Id*. at ¶ 4.

Griffis agrees that the doctors were employed by OGC. *Plaintiff's Response* (Doc. 151)(*hereinafter Resp.*). at ¶ 5. However, he maintains OGC performed mental status exams on persons by court order. *Id.* He also maintains Dr. Clay and Dr. Farrow provided medical orders

---

[1]With respect to each statement of material facts as to which defendants maintain there is no issue of fact to be tried, Griffis was asked if he agreed, disagreed, or was without knowledge to agree or disagree. If he disagreed, he was asked to explain. Griffis was referred to the exhibit offered by defendants to support their statements.

AO72A
(Rev. 8/82)

to Sheriff Medford and Lt. Beth Reely at the Carroll County Jail. *Id.* at ¶ 5 & ¶ 13. He contends Sheriff Medford contacted defendants for medical services including orders and Reely was able to obtain orders from Dr. Farrow. *Resp. at* ¶ 5, ¶ 6 & ¶ 13. In Griffis' opinion this is being "employed" by the jail. *Id. at* ¶ 5, ¶ 6 & ¶ 13.

Dr. Farrow was taking call for Dr. Clay on January 2, 2004. *Clay's Aff. at* ¶ 5. On January 2nd, Dr. Farrow spoke with Beth Reely of the Carroll County Jail regarding Griffis. *Farrow's Aff. at* ¶ 4. Based upon Dr. Farrow's telephone conversation with Reely, her review of Griffis' records, her education, training and experience, Dr. Farrow requested that four of Griffis' medications, Lexapro, Paxil CR, Seroquel, and Trazodone, be discontinued and that he be tapered off another medication, Diazepam. *Farrow's Aff. at* ¶ 11.

Given the information provided Dr. Farrow by the Carroll County Jail which indicated Griffis was not being compliant in taking the medications that had been prescribed to him, and considering this information in light of his physical and mental condition as shown in the treatment records of the OGC, Dr. Farrow concluded this medical decision was entirely appropriate and well within the standard of care applicable to psychiatrists in good standing in the State of Arkansas. *Farrow's Aff. at* ¶ 5. In Dr. Farrow's opinion, the discontinuance and tapering of the medications, as outlined in her January 2, 2004, letter did not cause Griffis any harm or negatively impact his physical or mental condition or prognosis. *Farrow's Aff. at* ¶ 8. By affidavit, Dr. Farrow indicates she was not paid or compensated in anyway by the State of Arkansas or Carroll County, or any department or division of the State of Arkansas, or one of its counties, for any medical or psychiatric services she provided to Griffis. *Id.* at ¶ 6 & ¶ 13.

AO72A
(Rev. 8/82)

Within a week, Dr. Clay reviewed Dr. Farrow's letter of January 2, 2004, directed to Sgt. Beth Reely, Dr. Clay, and Diane Lyddon. *Clay's Aff. at* ¶ 5. Considering the information they had that Griffis was not being compliant with the medications prescribed to him, Dr. Clay had no disagreement with Dr. Farrow's recommendations. *Id.* In Dr. Clay's opinion, the medical decision Dr. Farrow made was entirely appropriate and well within the standard of care applicable to psychiatrists in good standing in the State of Arkansas. *Id.* In Dr. Clay's opinion, the discontinuance and tapering of medications, as outlined in Dr. Farrow's January 2, 2004, letter, did not cause Griffis any harm or negatively impact his physical or mental condition or prognosis. *Id.* at ¶ 7.

Griffis asserts that he had not been provided any evidence regarding Dr. Farrow's training or experience. *Resp.* at page 2. He also states that Dr. Farrow was not able to ascertain Reely's credentials or authority over the phone. *Id.* That an unknown caller was able to change an established medical regimen of a patient over the phone is in Griffis' opinion highly irregular, illegal, unethical, and unheard of in the medical community. *Id.* Griffis maintains Dr. Farrow's actions were clearly not within the standard of care expected within the medical community. *Id.* at page 3. With respect to Dr. Farrow's opinion that he was not harmed or negatively impacted by the discontinuance and tapering of the medications, Griffis asserts she would have no knowledge regarding this information because she made no attempt to follow-up on her orders or treatment. *Resp.* at ¶ 19.

Griffis maintains it is unethical and unprofessional conduct on Dr. Farrow's part to countermand another physician's orders, Dr. Malone's. *Resp.* at page 4. Griffis asserts a trained professional would never have encouraged a non-medical person, Reely, to discuss the medical

necessity of any treatment.  Finally, Griffis maintains Dr. Farrow made no attempt to follow-up on her treatment plan nor did Dr. Clay.  *Id.*

With respect to Dr. Clay, Griffis states if Dr. Clay reviewed Dr. Farrow's letter, he never advised Griffis "which is irresponsible and unprofessional–hence unethical."  *Resp.* at ¶ 14. Further, Griffis maintains there is no proof he was being non-compliant.  *Id.*  Griffis maintains this was based on the allegations of untrained persons.  *Id.*  As to Dr. Clay's opinion, Griffis states this calls for an expert medical opinion which neither Dr. Clay nor Dr. Farrow are qualified to offer. *Id.* at ¶ 15.

With respect to the medications being discontinued, Griffis maintains his mental and physical health deteriorated remarkably.  *Resp. at* ¶ 17.  He states he became depressed, despondent and anxious.  *Id.*  He also states he was nervous, scared, and unable to socialize appropriately.  *Id.*  He asserts he will never heal from the mental anguish he suffered at the hands of these people.  *Id.*

Dr. Clay asserts by affidavit that he never refused to treat Griffis and did not discharge Griffis from his care.  *Clay's Aff. at* ¶ 6.  Defendants also assert OGC never refused to treat Griffis and did not discharge him from its care.  *Farrow's Aff. at* ¶ 7.  Griffis, however, states there is a discharge summary in the medical records.  *Resp.* at ¶ 18.  Griffis did not attach the medical record to his response.

Griffis was asked to explain how medication was dispensed at the Carroll County Jail.  He indicated everyone, including trustee prisoners, could pass out medication.  *Resp. at* ¶ 20.  When medication was dispensed, he signed for it.  *Id.*  Over the course of his incarceration, he maintains there were numerous incidents of his medication not being dispensed for a variety of reasons

-5-

including the prescription having run out, the prescription not having been promptly refilled, the

medication being stolen, etc.  *Id.*  To the best of his recollection, he took all his medicine, when

it was offered.  *Id.*

As a result of the discontinuance of the medications by Dr. Farrow, Griffis states his

psychiatric symptoms were exacerbated by the abrupt withdrawal.  *Resp.* at ¶ 21.  He indicates he

suffered nauseating headaches, shakes, vomiting, thoughts of impending doom, abnormal fear of

sounds, sweats, elevated blood pressure, pulse, dizziness, loss of appetite, suicidal thoughts and

tendencies, hyperventilating, constipation, dry mouth, confusion, and mental disorientation.  *Id.*

Griffis was asked to explain in detail how he believed Dr. Clay exhibited deliberate

indifference to his serious medical needs.  He responded:

> It is indisputable that I had numerous serious medical needs.  Dr. Clay had been
> treating me for some years and stated that I (Plaintiff ) have a serious mental
> illness. (A serious medical need).  He was also clearly aware that I had attempted
> suicide on more than one occasion, mutilated myself numerous times–he in fact
> admitted me to the hospital for this serious medical need.  He was aware that I
> suffered great personal loss and life changes (brother's death, father's death,
> divorce, loss of children, etc.) yet failed to respond to those needs, refusing to
> accept calls from me during times of personal crisis and most importantly, failed
> to stay informed of my condition.  His obligation to me was to follow up after Dr.
> Farrow suppo[s]edly contacted him in reference to her new orders–He knew
> something was going on and failed to do anything to protect his patient.

*Resp. at* ¶ 22.

Griffis was asked to explain in detail how he believed Dr. Farrow exhibited deliberate

indifference to his serious medical needs.  He responded:

> Dr. Farrow knew I had serious medical needs and chose to practice medicine as
> dictated by the untrained, unqualified Defendant Reely.  She also failed to contact
> Dr. Clay when she was first contacted by Reely.  She also placed her responsibility
> of contacting the other Dr. (Malone) to Reely.  Dr. Farrow placed me in grave
> danger–then ignored me.  Her actions are unheard of in the medical community.
> The Dr.s responsibility and obligation was to follow through with her treatment

-6-

plan–and she didn't.  This is an incredibly dangerous and life threat[e]ning practice certainly not accepted by trained, educated and experienced doctors.  Clearly indifference.

*Resp. at* ¶ 23.

Griffis maintains both Dr. Farrow and Dr. Clay acted under the direction of agents of the Carroll County Sheriff's Department.  *Resp. at* ¶ 24.  Griffis asserts both doctors carried out requests and instructions of agents of the sheriff's department.  *Id.*  He maintains the doctors conspired with agents of the sheriff's department.  *Id.*  The fact that the doctors were not paid for their work in Griffis' mind proves the conspiracy.  *Id.*  Griffis maintains this court "would set a deadly prec[e]dent by allowing these doctors to act without consequences."  Id.

## II.  Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

AO72A
(Rev. 8/82)

"A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III.  Discussion

Defendants have now moved for summary judgment contending they did not act under color of state law.  If it is somehow concluded they acted under color of law, defendants contend there is no evidence of deliberate indifference on their part.

### *Color of Law/State Action*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that each defendant acted under color of state law and that he or she violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).   The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Defendants first argue that as private physicians they are not state actors for purposes of § 1983.   In *Montano v. Hedgepeth*, 120 F.3d 844 (8th Cir. 1997), the Eighth Circuit set forth the analysis to be applied in determining whether state action exists for purposes of § 1983. Specifically, the court said:

> In ascertaining the presence of state action, we must examine the record to determine whether "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S.

-8-

922, 937, 102 S. Ct. 2744, 2753, 73 L. Ed. 2d 482 (1982). Resolving this
question entails a journey down a particularly fact-bound path, *see id*. at 939, 102
S. Ct. at 2754-55, but the Supreme Court has identified two legal touchstones to
provide guidance along the way. To begin with, there can be no "fair attribution"
unless the alleged constitutional violation was "caused by the exercise of some
right or privilege created by the State or by a rule of conduct imposed by the State
or by a person for whom the State is responsible." *Id*. at 937, 102 S. Ct. at 2753.
Furthermore, "the party charged with the deprivation must be a person who may
fairly be said to be a state actor. This may be because he is a state official,
because he has acted together with or has obtained significant aid from state
officials, or because his conduct is otherwise chargeable to the State." *Id*.; *see
also Roudybush v. Zabel*, 813 F.2d 173, 176-77 (8th Cir.1987) (repeating two part
test).

*Montano*, 120 F.3d at 848. *See Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir.

2007)("If a party's conduct meets the requirements for state action, the same acts also qualify as

actions taken 'under color of state law' for purposes of § 1983.").

With respect to physicians, it has been held that a "prison doctor doubles as a state actor

when engaging in the medical treatment of inmates." *Montano*, 120 F.3d at 849 (*citing West v.

Atkins*, 487 U.S. 42, 51-52, 108 S. Ct. 2250, 2256-57, 101 L. Ed. 2d 40 (1988)). Although the

Supreme Court in *West* recognized that a physician was ethically bound to make independent

medical judgments on behalf of his patient, it noted that "the health care afforded to inmates is

a result of 'close cooperation' and a 'joint effort' between medical professional and correctional

administrators." *Montano*, 120 F.3d at 849 (*citing West*, 487 U.S. at 51, 108 S. Ct. at 2256).

The courts are not in agreement as to whether a private physician who treats a prisoner

must be under contract with a correctional facility to be considered a state actor for purposes of

§ 1983. *Compare Conner v. Donnelly*, 42 F.3d 2002, 225 (4th Cir. 1994)(*West* applies to private

physicians who treat state prisoners without the benefit of a contract when the state authorizes

the physician to provide medical care to the prisoner) with *Sykes v. McPhillips*, 412 F. Supp. 2d

-9-

197 (N.D.N.Y. 2006)(no state action where private physical was not under contract and treated prisoner in hospital outside of prison).

However, we find instructive the Eighth Circuit's application of the functional view of state action in *Montano*, 120 F.3d at 850. In that case the Eighth Circuit was asked to determine whether a prison chaplain was a state actor for purposes of § 1983 when he engaged in inherently ecclesiastical functions. The court noted that a chaplain "sometimes behaved in ways which are beyond the bounds of governmental authority" and was "not answerable to an administrative supervisor."

Similarly, we believe a private physician treating an inmate at a private facility utilizing his independent medical judgment is not answerable to the state and does not act under color of state law for purposes of § 1983. We find too little connection between the state and Dr. Farrow and Dr. Clay. We believe when consideration is given to the relationship between the state, the physician, and the plaintiff in this case that Dr. Farrow and Dr. Clay cannot be said to be a state actors for purposes of § 1983. Under the facts of this case, there are few connections between the state and the defendants. Defendants had no contractual relationship with the state, no state doctor referred Griffis to OGC, there is no proof on an ongoing relationship between defendants and the Carroll County Jail, the treatment rendered Griffis began before his incarceration at the Carroll County Jail and resumed in 2002. *See e.g., Nunez v. Horn*, 72 F. Supp. 2d 24 (N.D.N.Y. 1999).

Griffis wants the court to focus solely on the actions that occurred following the January 2, 2004, conversation between Dr. Farrow and Reely. It is true that as a result of this conversation and a review of his records, Dr. Farrow ordered several of his medications

-10-

discontinued and/or tapered off.  This is the point at which Dr. Farrow relied, at least in part, on information provided her by Reely in making the decision to alter Griffis' medication regimen.

This fact, however, does not alter the court's analysis with respect to whether Dr. Clay or Dr. Farrow were state actors.  Instead, Reely merely spoke with Dr. Farrow regarding Griffis' alleged non-compliance with taking prescription medication.  We believe this falls far short of establishing the willful participation necessary to establish a the existence of a conspiracy. *See e.g., Dossett v. First State Bank*, 399 F.3d 940, 951 (8th Cir. 2005)("Under § 1983, a plaintiff must establish not only that a private actor caused a deprivation of constitutional rights, but that the private actor willfully participated with state officials and reached a mutual understanding concerning the unlawful objective of a conspiracy.").  Griffis already had an ongoing relationship with the OGC and Dr. Clay.  Dr. Farrow just happened to be taking calls for Dr. Clay that day.

### Deliberate Indifference

Even if we assume for purposes of this motion that Dr. Clay and/or Dr. Farrow acted under color of state law, we would nevertheless find them entitled to summary judgment in their favor because there are no genuine issues of fact as to whether Griffis' Eighth Amendment right to adequate medical treatment was violated.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth

-11-

Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007).  In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting  Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).  *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

Griffis "must clear a substantial evidentiary threshold to show that [defendants] deliberately disregarded the inmate's needs by administering inadequate treatment." *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007).  Griffis' "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise

AO72A
(Rev. 8/82)

to the level of a constitutional violation." *Id.*, 487 F.3d at 1118-19 (internal quotation marks and citation omitted).

Here, Griffis merely offers his opinion that discontinuing some of his medications and tapering off others without adequate follow-up care was extremely dangerous. He "cannot create a question of face by merely stating that [he] did not feel [he] received adequate treatment." *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997). Negligence, mis-diagnosis, or even medical malpractice does not violate a prisoner's Eighth Amendment rights. *Id.*

## IV. Conclusion

For the reasons stated, I recommend the motion for summary judgment filed on behalf of Dr. Theresa Farrow and Dr. Donald Clay (Doc. 84) be granted and all federal claims against them be dismissed with prejudice. To the extent the complaint can be read to be asserting supplemental state law claims against them, I recommend that the court decline to exercise supplemental jurisdiction over those claims. 28 U.S.C. § 1367(c)(3).

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **31st day of August 2007.**

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)