IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


MICHAEL S. GRIFFIS                                                        PLAINTIFF

              v.                        Civil No. 05-3040

SHERIFF CHUCK MEDFORD;
LT. BETH REELY; JIMMY
KEELAND; MICHAEL BROWN;
PETE MOSS; JACK GENTRY;
MARK LOTTA; DR. THERESA FARROW;
DR. DONALD CLAY; SHELIA M.
HOWERTON; and REGINA FOX JEFFREY                              DEFENDANTS


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.

Griffis is currently incarcerated at the Arkansas Department of Correction.  This case concerns a period of time while Griffis was incarcerated in the Carroll County Detention Center.  During his incarceration there, Griffis contends he was subjected to unconstitutional conditions of confinement, denied adequate medical care, and punished without due process of law.  He contends this punishment took two forms being placed on lock-down and being placed for extended periods of time in an "emergency response chair" or restraint chair.

The Carroll County Defendants, all defendants except Dr. Theresa Farrow and Dr. Donald Clay, filed a summary judgment motion (Doc. 89).  To assist Griffis in responding to the summary judgment motion, a questionnaire was propounded (Doc. 142) by the court.  Griffis filed a timely response to the questionnaire and also filed a seventeen page handwritten response

-1-

objecting to the form and content of the questions propounded by the court (Doc. 154) and providing the court with additional information regarding certain of his responses.[1]  Finally, Griffis submitted to the court as exhibits documents that are approximately seven inches thick and are not numbered or marked as plaintiff's exhibits.  The documents include, among other things, jail logs, records of meals served, activity logs, copies of grievances, medical requests, treatment records, and what appears to be a complete copy of defendants' motion for summary judgment and all exhibits.

The summary judgment motion is before the undersigned for issuance of this report and recommendation.

## I.  Background

Griffis was booked into the Carroll County Detention Center (CCDC) on January 6, 2003, on pending criminal charges.  *Plaintiff's Response* (Doc. 151)(*hereinafter Resp*) at ¶ 1; *Defendants' Exhibit* (*hereinafter Defts' Ex.*) 1 at page 1.  As part of the intake papers, Griffis signed a medical authorization so that the Sheriff's Office could obtain information regarding his physical and mental condition.  *Defts' Ex.* 1 at page 5.

Griffis states he was forced to sign the intake papers under duress and was unaware of what he was signing.  *Resp.* at ¶ 2.  Further, he argues it is irrelevant to the alleged constitutional violations at hand.  *Id.*  However, this document is relevant to the extent that it explains how the defendants were able to speak with, and obtain information from, Griffis' medical care providers.

---

[1]With respect to each statement of material facts as to which defendants maintain there is no issue of fact to be tried, Griffis was asked if he agreed, disagreed, or was without knowledge to agree or disagree.  If he disagreed, he was asked to explain.  Griffis was referred to the exhibit offered by defendants to support their statements.  In response to the vast majority of statements, Griffis responded that he was without knowledge to agree or disagree.  This is true despite the fact that many of the statements of material fact were based on grievances and/or requests he submitted while at the detention center.

Griffis had been incarcerated in the CCDC in 1994 on pending criminal charges. *Defts'*
*Ex.* 7 at page 11. According to defendants, Griffis told Beth Reely that he had been a licensed
practical nurse (LPN) and that his license had been taken away prior to his incarceration in 1994.
*Defts' Ex.* 4A at page 11.

On February 17th, Griffis stuck a pencil into his abdomen. *Defts' Ex.* 3B at page 2. He
was taken to St. John's emergency room for treatment. *Id.* at pages 2-3. He was prescribed an
antibiotic and told to change his dressing daily. *Id.*

On March 22nd, Griffis wrote a multiple page document containing various "complaints"
and suggestions regarding the conditions at the CCDC. *Resp.* at ¶ 9(A). Griffis indicated the
cells were filthy and there were gnats, flies, spiders, and mice; it sometimes took days to get
request forms; the pre-shower room needed a drain to avoid bacterial growth; there was only one
set of hair clippers which were not cleaned between uses; there was no access to law library
material; no medical staff; and the jailers had no medical training. *Id.* at ¶ 9(B)-¶ 9(D), ¶ 9(F)-¶
9(H).

Griffis indicated the food was very good, served at a decent temperature, the dishes were
clean, and the whole kitchen staff worked well. *Resp.* at ¶ 9(E). While this was true when written,
Griffis states the next thirty months was different. *Id.* He sates there were dozens of meals that
were not served, food that was withheld, bologna sandwiches that were put in the blender, and
expired food that was served, etc. *Id.*

On April 21st, Griffis was taken to the Carroll Regional Medical Center for treatment for
his hand. *Defts' Ex.* 3A at page 55. He had been involved in an alteration in the jail. *Id.* His

-3-

right hand was x-rayed.  *Id.* at pages 57 & 59.  No fractures were noted.  *Id.*  The hand was wrapped in an ace bandage and he was told to elevate his hand.  *Id.*

At 7:55 a.m. on June 12th Griffis was complaining of chest pain, left arm pain, weak legs, and a headache.  *Resp.* at ¶ 11.  Medical personnel were summoned and at arrived at 8:20 a.m.  *Id.*  Jail personnel were told to observe him.  *Id.*  Griffis was moved to an observation cell so that he could be monitored.  *Id.*

Griffis maintains the medical personnel that were summoned were not trained to make the medical diagnosis.  *Resp.* at ¶ 11.  Griffis asserts he was then observed by untrained and unqualified jail staff.  *Id.*  Moreover, he maintains the officers did not make rounds to check on him or observe.  *Id.*

On June 23rd, Griffis stated he was having pain in the side of his head above his right eye.  *Defts' Ex.* 4A at page 10.  He also stated he was throwing up.  *Id.*  He asked to see Dr. Malone, Dr. Nash, or Dr. Carol[2] for an emergency visit.  *Id.*

On June 24th, Griffis submitted a grievance stating that he had a migraine the previous day and had been having them for fourteen years.  *Defts' Ex.* 4A at page 11.  He indicated that he knew how to treat them.  *Id.*  He stated his Mother had offered to pay for the visit and any medications.  *Id.*

On June 25th, a notation was made that Officer McGee spoke with Griffis and told him to have his Mother make an appointment and tell them when it was.  *Defts' Ex.* 4A at page 13.

---

[2]Griffis indicates there is no Dr. Carol.  *Resp.* at ¶ 12(A).  He does not explain who he was referring to in this request despite the fact that he wrote the request.  *Defts' Ex.* 4A at page 10.

Griffis does not recall if he had his Mother set up an appointment for him. *Resp.* at ¶ 12(D). However, he notes it was the legal responsibility of the defendants not his Mother. *Id.*

On July 1st, Griffis submitted a medical request stating that he was having recurring migraines, nausea and vomiting. *Resp.* at ¶ 13(A). He stated he would like to see a doctor today. *Id.* McGee was asked to check it out and see if Griffis was eating, watching television etc. *Defts' Ex.* 4A at page 14. In response, McGee said Griffis was acting just fine and his problems might be due to his teeth which were going to be pulled the following day. *Id.*

Griffis maintains McGee was not qualified to make a medical opinion or trained to observe signs and symptoms of disease or illness. *Resp.* at ¶ 13(B). Griffis states his problems might have been due to many things including a brain tumor, an aneurysm, cancer, etc. *Id.*

On July 2nd, Griffis submitted another medical request. *Defts' Ex.* 4A at page 15. He stated that he was having drastic migraine headaches. *Id.* He indicated he was having nausea and vomiting and was at times unable to move. *Id.* He stated he did not understand why they refused to let his Mother pay for his visit and medicines after he was told to go ahead and make the appointment. *Id.*

In response, Griffis was told a headache was not an emergency. *Defts' Ex.* 4A at page 15. He was also told he had a dental appointment that day and his headache might be due to that. *Id.* Griffis maintains first that defendants had the obligation to provide him medical care not his Mother. *Resp.* at ¶ 14(A). Second, he contends Reely was not qualified to make the determination whether or not a migraine headache was an emergency. *Id.* at ¶ 14(B).

-5-

On July 3rd, Griffis submitted a medical request. *Defts' Ex.* 4A at page 16.  He stated he had suffered from migraines for eleven years and they were making a comeback.  *Id.*  He indicated Dr. Malone had him on some medicine that helped.  *Id.*  He stated his headaches were getting worse.  *Id.*  He stated his Mother would pay.  *Id.*  In response, Griffis was told to have an appointment made, let them know, and he would be transported to the appointment.  *Id.*

On July 9th, Griffis submitted another request asking for an appointment because of his migraine headaches.  *Defts' Ex.* 4A at page 17.  On July 9th, Griffis also requested an appointment be made with his psychiatrist so he could talk to him about his medications.  *Id.* at page 19.  Griffis stated he was out of some medication and believed some needed to be changed.  *Id.*  An appointment was scheduled for July 28th at the Ozark Guidance Center (OGC).  *Id.* at pages 17 & 19.

On July 10th, Griffis submitted a grievance stating he had been out of Lexapro for six to eight weeks and were now out of Klonopin.  *Defts' Ex.* 4A at page 20.  Griffis indicated he explained to McGee that he switched between Valium and Klonopin.  *Id.*  He indicated he was getting nervous and jittery.  *Id.*

Griffis was asked to explain what condition or conditions he was prescribed the Lexapro, Klonopin, and Valium for.  He responded:  "This answer is a complex medical opinion which the Dr.s themselves objected to answering.  Dr. Clay had been prescribing my medications for years."  *Resp.* at ¶ 18(B).

-6-

On July 15th, Griffis submitted a medical request stating that he needed to talk to the doctor about changing his medications. *Defts' Ex.* 4A at page 21.  He stated he was supposed to go once a month to see the doctor and once a week to see the therapist and had done neither. *Id.*

In response, Griffis was told Dr. Clay was on vacation and was not available until later in August. *Defts' Ex.* 4A at page 21.  He was told an appointment had been made for him later in the month at the earliest possible time according to OGC.  *Id.*

Griffis maintains a psychiatric emergency, especially for a suicidal patient, is the same as a medical emergency. *Resp.* at ¶ 19(B).  He asserts it was defendants' responsibility to obtain appropriate treatment for him.  *Id.*  He notes defendants were later able to reach Dr. Farrow to have his medication discontinued when Dr. Clay was unavailable.  *Id.*

On July 30th, at 6:15 a.m. Griffis' prescription of Clonazepam ran out but OGC had said a prescription of Valium would be called in and Griffis should take it in its place. *Defts' Ex.* 2A at page 2.  Attempts were made to verify this with OGC.  *Id.*  Griffis maintains the prescription should never have been allowed to run out completely before an attempt was made to refill it. *Id.*

At 10:40 a.m. the Valium prescription was filled and delivered to the jail. *Defts' Ex.* 2A at page 2.  Griffis was given the Valium with his noon medication.  *Id.*  Griffis believed he should have received a 10 mg. dosage of Valium not a 5 mg. dosage.  *Id.* at page 3.  OGC was contacted and advised CCDC personnel that the dosage had been changed to 5 mg. on purpose. *Id.*

-7-

According to defendants, in August of 2003 and early January of 2004, Griffis was the only inmate at the CCDC taking Seroquel. *Defts' Ex.* 7 at page 11. On August 28th, a Seroquel tablet was found hidden in another inmate's cell after Griffis had gone to recreation with the inmate. *Defts' Ex.* 7 at page 11; *Defts' Ex.* 2A pages 5-7. Thomas Householder said Griffis gave him the pill to help him sleep. *Id.*

Griffis denies he gave Householder the pill. *Resp.* at ¶ 21-22. He also points out that no one verified he was the only one in the jail on Seroquel, no one ever tested the pill, and he was never charged or found guilty of a disciplinary violation in connection with this incident. *Id.* and handwritten pages 5-7.

On October 3rd, Griffis submitted a medical request stating that his left knee was swollen and very painful. *Defts' Ex.* 4 at page 23. He stated that it looked like he had been bitten by a spider. *Id.* He indicated it hurt to stand or walk. *Id.*

Griffis' knee was examined and it was observed to be swollen with two hole like indentations. *Defts' Ex.* 4A at page 23. He was given a bag of ice and monitored. *Id.*

On October 22th, Griffis submitted a medical request asking for treatment for a herniated disc. *Defts' Ex.* 4A at page 25. He stated that the herniated disc had been established through MRI's and CT scans. *Id.* He indicated he was in a great deal of discomfort and wanted to speak to the doctor about trigger point injections and being put back on Ultram. *Id.* An appointment was made for Griffis with Dr. Malone on October 29th. *Id.*

-8-

On November 17th, Griffis and Raymond Mock complained to Jailer Brown that they had insect bites. *Defts' Ex.* 4A at page 27.  Brown reported to Reely that the bites looked like they needed medical attention. *Id.*

Reely called Lake Harrison Clinic and asked for emergency appointments. *Defts' Ex.* 4A at page 27.  Reely was told they would work both of the inmates in. *Id.*  Griffis was taken to the clinic, examined by the doctor, and given a prescription that was filled the same day. *Id.*

In a memorandum to Sheriff Medford dated November 19th, Reely indicates she requested Terminex to come in and spray for spiders and other insects that week. *Defts' Ex.* 4A at page 27.  Reely's memo indicates she also requested that "Terminex be allowed to come and spray the jail area on a monthly basis to prevent further discomfort to the inmates and the expense of doctor's visits and prescriptions." *Id.*

Griffis notes that he had complained back in March about the vermin especially the spiders. *Resp.* at ¶ 25(C).  He states the "gates were closed after the horses got out." *Id.*

On December 1st, Griffis requested an appointment with Dr. Malone because of his degenerative joint disease and herniated disc. *Defts' Ex.* 4A at page 28.  An appointment was made for him on December 3rd. *Id.*

On December 16th, there was an altercation between Griffis and Jim L. McDonald. *Defts' Ex.* 2A at pages 8-9.  Griffis told Officer Ralph Gordon that McDonald had started hitting and kneeing him for no reason. *Id.* at page 9.  Griffis was bleeding from the face area. *Id.*  A Polaroid picture was taken of Griffis' injuries and emergency medical personnel from St. John's were summoned. *Id.*

-9-

McDonald reported that Griffis walked up to him during recreation and hit him on the left side of his face with a closed right fist. *Defts' Ex.* 2A at page 9. McDonald claimed he merely defended himself by striking Griffis and then taking him to the ground. *Id.* McDonald had abrasions on his neck and jaw and a contusion just below his left eye. *Id.* There was blood on his pants bottom, left leg. *Id.* McDonald denied he needed medical attention. *Id.*

Griffis was taken to the emergency room at St. John's for treatment for facial lacerations following the altercation. *Defts' Ex.* 3B at page 8. He had a laceration that required sutures that were to be taken out in five days. *Id.* at page 10. *See also Resp.* at ¶ 27(B).

Griffis maintains he was not taken back to the hospital to have the sutures removed. *Resp.* additional handwritten pages at 8. Instead, he states he had to chew the sutures out. *Id.*

On December 17th, it was decided criminal charges would not be filed against Griffis as a result of the altercation with McDonald. *Defts' Ex.* 2A at page 22.

On December 29th, a prescription was written to resume Griffis' Paxil CR 12.5 mg. and Seroquel. *Defts' Ex.* 4A at page 32. On January 2, 2004, Sgt. Reely informed Dr. Farrow that Griffis had been trading his medications on the black market. *Defts' Ex.* 4A at page 33. In response, Dr. Farrow requested that four of Griffis' medications, Lexapro, Paxil CR, Seroquel, and Trazodone, be discontinued and that he be tapered off another medication, Diazepam. *Id.*

On January 3rd, an inmate, Eric Etchison, gave Jailer Brown a pill that he claimed came from Griffis. *Defts' Ex.* 2A at page 27. According to defendants, the pill was later identified as Seroquel and Griffis was the only inmate in J-Block who took Seroquel. *Id.* Griffis and Etchison went to recreation together. *Id.* Reely indicated she reported these findings to the doctors who were prescribing the medications including the OGC. *Defts' Ex.* 7 at page 11.

Griffis maintains this is merely an unsubstantiated statement. *Resp.* at ¶ 31(A). Moreover, he states the pill could have been anything. *Id.* He points out that he was never found guilty of any infraction. *Id.* at ¶ 31(B).

On January 12th, Griffis requested copies of the letter from the doctor who ordered four of his medications discontinued. *Defts' Ex.* 4A at page 35. He stated he wanted to show the copy of the letter to the court. *Id.* He also stated that his sink broke and he did not have access to fresh water. *Id.*

In response, Griffis was told that his attorney had been faxed a copy of doctor's letter after Griffis' visit with the attorney on Friday. *Defts' Ex.* 4A at page 35. Griffis' was also told the faucet in the sink worked fine and he could obtain water out of it. *Id.* It was just the fountain that did not work. *Id.*

Griffis maintains the letter is irrelevant to his claim. *Resp.* at ¶ 33(A). However, he states the sinks and toilets were constantly breaking, shut off, overflowing and flooding the jail. *Id.* He also states his sink was broke and water was frequently unavailable. *Id.* at ¶ 33(B).

On January 13th, Griffis submitted a request for medical treatment for excruciating back pain and a migraine. *Defts' Ex.* 4A at page 36. He asked to be taken to Dr. Malone. *Id.* An appointment was made that day for 4:15. *Id.*

On January 15th, Jailer Keeland brought Griffis to the booking desk for his medication. *Defts' Ex.* 2A at page 28. Griffis was given his Oxycodone and he stated he wanted some Tylenol too. *Id.* Keeland asked where the Oxycodone tablet was and he stated he had taken it. *Id.* Keeland didn't believe Griffis because it looked like he was hiding something. *Id.*

-11-

Keeland checked Griffis' hands and found what was determined to be Raymond Mock's Chlorpromazine 25 mg. tablet. *Defts' Ex.* 2A at page 28. Mock was Griffis' cellmate. *Id.*

On January 15th, Mock wrote a statement in which he stated he took his two pills when they were brought. *Defts' Ex.* 2A at page 29. He indicated that he was told Griffis had one of his pills in Griffis' pocket. *Id.* Mock stated he may have dropped one of his pills after morning or evening medication on the floor without realizing it because he was half asleep. *Id.*

Griffis states he was never charged with or found guilty of any wrongdoing in connection with this incident. *Resp. at additional page 10.* Moreover, he states it simply does not make sense that he would ask for more Tylenol when he was already getting Tylenol as acetaminophen is one of the drugs contained in Oxycodone. *Id.*

On January 15th, Keeland brought Griffis to booking to take his medication. *Defts' Ex.* 2A at page 30. Griffis was asked to drink the water he was given while taking his medication. *Id.* Griffis refused to drink the water. *Id.* Griffis indicates he didn't want or need the water if he didn't drink any. *Resp.* at ¶ 37(B).

Sgt. McGee asked Griffis to drink his water to the best of his ability while he took his medication. *Defts' Ex.* 2A at page 31. McGee asked Griffis two more times. *Id.* Griffis refused. *Id.*

Griffis maintains this is completely irrelevant to his claims. *Resp.* at ¶ 37(C). He points out he was never found guilty of refusing to obey an order. *Id.*

-12-

On February 2nd, Griffis submitted a request for dental care saying he had a large hole in his tooth causing his a great deal of pain. *Defts' Ex.* 4A at page 42. A dental appointment was made for him for the following day. *Id.*

On February 18th, Griffis submitted a medical request stating he had a foul smelling rectal discharge and had been experiencing loose stools for fourteen or fifteen days. *Defts' Ex.* 4A at page 44. An appointment was scheduled for him to see the doctor the following day. *Id.*

Griffis was seen by Dr. Malone on February 25th. *Defts' Ex.* 4D at page 10. On February 26th, Dr. Malone advised the Sheriff's Office to discontinue Griffis' Inderal. *Id.*

On March 13th, Griffis had a cardiovascular stress test at St. John's Hospital. *Defts' Ex.* 3A at page 64. Dr. Malone had ordered the test. *Id.* The test was negative and Griffis' pain was determined to be non-cardiac in nature. *Id.*

On March 14th, Griffis submitted a medical request stating that he was to have a follow-up visit with Dr. Castillo according to Dr. Horton. *Defts' Ex.* 4A at page 45. He stated he was still having severe chest pains every day. *Id.*

Reely responded that she had spoken with Dr. Horton's office and was told Griffis' stress test had showed everything was fine and that future appointments should be with his family doctor, Dr. Malone. *Defts' Ex.* 4A at page 45. Griffis was asked if he wanted an appointment scheduled with Dr. Malone. *Id.*

Griffis responded that Dr. Malone is not and never had been his family doctor. *Defts' Ex.* 4A at page 47. Griffis stated Dr. Steusby was his doctor for many years. *Id.* Griffis indicated he didn't want there to be any mis-communication but he didn't care who he saw he

-13-

just wanted his chest to quit hurting. *Id.* Griffis also states Dr. Malone practiced at the same clinic as Dr. Steusby and had access to his records. *Resp.* at ¶ 41(C).

Reely responded that Dr. Horton's office said it was Dr. Malone. *Defts' Ex.* 4A at page 47. Furthermore, she noted that Griffis had previously requested Dr. Malone when there had been a meeting in the office with the Sheriff, Griffis' attorney, and Griffis. *Id.*

On March 30th, Griffis submitted a medical request asking about his appointment for chest pain. *Defts' Ex.* 4A at page 48. He stated he was still having severe chest pain and some routine discomfort. *Id.* In response, Griffis was told his appointment had been scheduled and it was that day. *Id.*

On April 26th, Griffis submitted a request stating that he ran out of Ultracet for chest wall pain on the 22nd and it still had not been re-filled. *Defts' Ex.* 4A at page 49. In response, Griffis was told his prescriptions had been re-ordered and should be there today. *Id.* He was told he would receive them as soon as the jail got them. *Id.*

Griffis maintains the prescriptions were merely re-fills. *Resp.* at ¶ 43(B). As all the defendants had to do was pick them up before he ran out, he maintains it was deliberate indifference on their part not to take this simple step. *Id.* He notes the pharmacy was only approximately a hundred feet from the jail. *Id.*

On May 6th, Griffis requested medical care for his ear. *Defts' Ex.* 4A at page 50. An appointment was made for him to the following day. *Id.*

Griffis was seen at Home Town Health Care, Inc. *Defts' Ex.* 4A at page 59. Griffis indicates he was seen by Shelia Howerton who is not a doctor. *Resp.* at ¶ 44(B). He also

maintains the medication he was prescribed was ineffective and he was still sick after a round of antibiotics. *Resp.* at *Additional Page* 12.

On May 23rd, Griffis indicated his ear infection was back and he had just finished a round of antibiotic. *Defts' Ex.* 4A at page 51. He stated he thought he was getting a sinus infection too. *Id.* Reely contacted Shelia Howerton who called in a prescription for Griffis. *Id.*

On May 30th or May 31st, Griffis submitted a medical request stating that he was very sick. *Defts' Ex.* 4A at page 53. He indicated his throat was swollen and both ears were very painful. *Id.* He also stated that routine showers should not be taken away when there was so much sickness in the jail. *Id.*

In response, Griffis was told he missed his shower because he was locked down due to contraband being found in his cell and one of his pills had been found with another inmate. *Defts' Ex.* 4A at page 53. He was also told another appointment had been made about his ear problem. *Id.* He was treated by the doctor on June 1st. *Id.*

On June 7th, Griffis submitted a medical request saying that his ears were still painful. *Defts' Ex.* 4A at page 54. In response, a notation was made that he would be monitored. *Id.* Griffis asserts the defendants were not trained or qualified to monitor inmates for illness or disease. *Resp.* at ¶ 47(A). Griffis also asserts they did not monitor him. *Id.*

On June 16th, Griffis' attorney wrote Sheriff Medford and indicated Griffis was still having difficulties with his ears and needed to get some medication to clear up the problem. *Defts' Ex.* 4A at page 62. He also indicated Griffis still had many cavities and needed those repaired. *Id.*

-15-

On June 17th, Griffis submitted a medical request stating that he was having breathing difficulties that made him panic at times. *Defts' Ex.* 4A at page 55. Officer Brown talked to Griffis and he indicated the problem might be stress related. *Id.* On June 21st a doctor's appointment was made for Griffis with Dr. Malone and a list of Griffis' current medications sent to him. *Id.* at 61.

On July 9th, Griffis submitted a request stating he had a bad tooth problem and indicating he would like to see a dentist. *Defts' Ex.* 4A at page 63. In response, he was told an appointment would be made. *Id.*

Griffis states he submitted requests for medical and dental care as problems arose. *Resp.* at ¶ 49(A). However, because of the inconsistent and poor diet he was receiving, the lack of toothpaste, and no outside recreation, he maintains he suffered continuous problems. *Id.* at ¶ 49(A) & ¶ 49(B). He maintains the appointments were fruitless since he was just brought back and placed in the same environment. *Id.* According to Griffis, even the toothpaste he was given by Dr. Spulin was confiscated because it had not been "prescribed" by a doctor. *Id.*

On July 28th, Griffis submitted a request which stated he had an appointment to see Dr. Spulin and he had given Griffis fourteen days of antibiotics. *Defts' Ex.* 4A at page 65. He indicated he needed orajel. *Id.* He stated his teeth were in bad shape and he needed something done. *Id.* He asked why he didn't get to go to the dentist. *Id.* He stated he was taking the equivalent of two aspirins four times a day but it was not very effective. *Id.*

In response Griffis was told the dentist said yesterday he needed a cleaning for his mouth pain and an appointment would be made. *Defts' Ex.* 4A at page 65. He was told that they did

-16-

not provide orajel.  *Id.*  He was also told that he could not take Ibuprofen.  *Id.*  Griffis could not

take Ibuprofen because it makes him nauseated.  *Resp.* at ¶ 50(C).

On August 6th, Griffis' attorney wrote Sheriff Medford.  *Defts' Ex.* 4A at page 67.

Stevan E. Vowell noted that Griffis had seen Dr. Spurlin on July 14th and was given a two week

prescription to clear up gum infection and then were to return on July 27th.  *Id.*  However, Griffis

was not taken to his July 27th appointment.  *Id.*  Vowell asked that Griffis get continuing dental

treatment.  *Id.*  Griffis recalls Dr. Spurlin was very upset at Sheriff Medford's refusal to have

Griffis return for a scheduled appointment.  *Resp.* at ¶ 51.

On August 6th, Griffis submitted a request stating that his right foot bones were painful

to the touch and his left leg where the bones had been exposed hurt.  *Defts' Ex.* 4A at page 68.

He said the aspirin and Tylenol didn't combat the pain well.  *Id.*  He stated this was not a request

to see the doctor and was simply meant to keep them and his attorney informed of the ongoing

situation.  *Id.*

On August 14th, Griffis requested cleaning supplies.  *Defts' Ex.* 4A at page 69.  In

response, he was told he could have cleaning supplies any time during day shift, Monday through

Friday.  *Id.*

According to Griffis, he frequently volunteered to clean cells just to get rid of the filth

in the jail and his offer was frequently denied.  *Resp.* at ¶ 53(A).  In reality, Griffis states he could

ask all he wanted and the defendants responded when they wanted.  *Id.*

AO72A
(Rev. 8/82)

Inmates were responsible for cleaning their own cells. *Resp.* at ¶ 53(B).   Griffis was

asked to explain what cleaning supplies were available and how he obtained the supplies.  He

responded:

> Cleaning supplies were brought around to each cell approx 8:00 am Monday
> through Friday–usually, sometimes not at all.  Breakfast and dinner were served
> in the cells and we were required to sweep and mop the area that meals were
> taken in.  This never happened, ever–in thirty three months.

*Resp.* at ¶ 53(B).

Common areas of the jail were cleaned by volunteers. *Resp.* at ¶ 53(C).  According to

Griffis, when cleaning supplies were offered, there was always someone willing to clean the day

room.  *Id.*  He notes that they had "mice, roaches, silverfish, spiders, snails, lice and scabies not

to mention mold, mildew and feces frequently on the floor from floodings."  *Id.*

On August 10th, Sheriff Medford replied to Vowell's letter. *Defts' Ex.* 4A at page 70.

He indicated that on July 27th, Dr. Spulin's office advised that Griffis needed a teeth/gum

cleaning procedure and the first available appointment was scheduled with the hygienist and that

was for August 19th.  *Id.*  Vowell was advised that Griffis was provided toothpaste daily, a

toothbrush to keep in his cell, and during the antibiotic treatment he was offered hydrogen

peroxide.  *Id.*  Sheriff Medford also advised Vowell that Griffis  made a suicide attempt that

morning and was on suicide watch.  *Id.*

Griffis asserts he was not given toothpaste daily. *Resp.* at ¶ 54.  He indicates they did

receive toothpaste at times but never daily.  *Id.*

On August 10th, Griffis was treated at the emergency room at St. John's Hospital in

Berryville. *Defts' Ex.* 3A at page 2; *Defts' Ex.* 3E at page 14.  Sutures were applied.  *Id.*  Griffis

-18-

was to wash the wound daily with soap and water, apply neosporin ointment and gauze dressing. *Id.* Griffis was prescribed an antibiotic and given a tetanus shot. *Id.* The sutures were to be removed on August 24th. *Id.*

The injury was to Griffis' lower left calf. *Resp.* at ¶ 55(B). Griffis maintains defendants were instructed to wash the wound daily and care for his leg. *Id.* at ¶ 55(A). However, his legs and arms were tied down and he states he wasn't even allowed to have toilet paper. *Id.*

Griffis was taken to the emergency room at St. John's again on August 22nd to have his legs checked. *Defts' Ex.* 4C at page 72. He was told to keep his legs elevated as much as possible. *Id.* He was to keep his wound clean and dry and cover it with silvadene daily. *Id.*

He was taken to the emergency room again on August 27th. *Defts' Ex.* 3C at page 55; *Defts' Ex.* 3D at page 1. He was instructed to take care of his wound or he would lose his leg. *Defts' Ex.* 3C at page 55.

A wound care kit was provided for day jailers containing hibiclens, gauze pads, irrigation rinse, prescription SSD 1% cream, gauze bandage, and a garbage bag. *Defts' Ex.* 3C at page 55. Jailers were to watch Griffis while he treated the wound and make sure they got all supplies back. *Id.* Griffis was to sign the sheet in the care kit for the products. *Id.* If Griffis refused to treat the wound, it was to be noted on the log. *Id.*

On August 28th, Griffis submitted a complaint that a deputy had tried to give him the wrong medication. *Defts' Ex.* 4A at page 71. Griffis indicated this was the fourth time this had happened although he had caught it each time. *Id.* He also said his Valium and Paxil prescriptions were short. *Id.* Finally, he said he was not getting the right supplies for his leg. *Id.*

In response, Griffis was told that his medications had been checked and were all accounted for. *Defts' Ex.* 4A at page 71. However, Griffis maintains there were more than one hundred and sixty incidents of his medicine being withheld by officers. *Resp.* at ¶ 57(B). On at least part of these occasions, he maintains the officers were ordered to withhold his medication. *Id.*

On August 30th, Griffis was treated at St. John's. *Defts' Ex.* 3E at page 9. He was told to apply dressings wet to dry twice a day and take Tylenol for pain. *Id.*

On September 9th, Griffis stated his left leg was very swollen and had a nasty discharge. *Defts' Ex.* 4A at page 75. He stated he was supposed to see Nurse Howerton or Dr. Burke and asked if the appointment could be expedited. *Id.*

In response, Griffis was told that since he and his attorney had complained that Nurse Howerton was not a real doctor that an appointment had been made for him with Dr. Malone. *Defts' Ex.* 4A at page 75.

Griffis indicates he and his attorney simply pointed out the fact that Nurse Howerton was not a doctor. *Resp.* at *additional page* 12-13. Once he was taken to Dr. Malone and began his treatment, Griffis states he finally began getting better after weeks of being sick. *Id.* He points out Nurse Howerton prescribed medication over the phone without even seeing him. *Id.*

On September 22nd, Griffis requested a screening by a mental health care worker. *Defts' Ex.* 4A at page 76. Griffis also asked that his appointment be rescheduled with Nurse Howerton. *Id.* Griffis stated she was attempting to regulate his antidepressant. *Id.*

In response, Griffis was told to discuss his request for a mental health examination with his attorney and they would take him when they received a court order. *Defts' Ex.* 4A at page

-20-

76. As to his request for an appointment with Nurse Howerton, Griffis was told that both he and his attorney had said Nurse Howerton was not a real doctor after he had been taken to see her and that all future appointments would be made with a "real doctor." *Id.*

On September 24th, Griffis complained that he had to wait several hours for a dressing change. *Defts' Ex.* 4A at page 77. In response Griffis was told the doctor's instructions were that he was to be allowed to change the dressing on his leg once a day. *Id.* Depending on the officers' schedule, the time of the change might vary. *Id.* Griffis maintains the dressing change was to occur during day shift. *Resp.* at ¶ 61(B).

On September 27th Griffis submitted a request (erroneously dated August 27th) that stated he had an appointment with Shelia Howerton and she was trying to get him back on a proper anti-depressant regimen. *Defts' Ex.* 4A at page 79. He stated that his appointment was canceled because he said she was not a real doctor. *Id.* He pointed out she was not a doctor but an advanced nurse practitioner. *Id.* He asked to see Nurse Howerton or Dr. Burke the jail doctor. *Id.*

Griffis was told he was not being refused a doctor. *Defts' Ex.* 4A at page 79. He was not being taken to Nurse Howerton because he and his attorney had complained she was not a real doctor. *Id.* He was told there was no jail doctor. *Id.* He was told that his appointments would be with Dr. Malone. *Id.* With respect to his mental health treatment, he was told to contact his attorney. *Id.*

On September 27th, Griffis submitted a grievance stating he asked for a bio-hazard bag to disposed of his old dressing from his leg. *Defts' Ex.* 4A at page 80. Once Griffis showered, he stated he waited all day for the new dressing. *Id.*

AO72A
(Rev. 8/82)

In response, Griffis was told they did not have bio-hazard bags and they hospital did not provide them. *Defts' Ex.* 4A at page 80.  He was also told that the staff tried to meet his personal needs.  *Id.*

On September 28th, Griffis was seen at St. John's emergency room regarding the wound on his left lower leg.  *Defts' Ex.* 3D at pages 16-17.  He was instructed to continue his wound care.  *Id.*

On September 29th, Griffis submitted a grievance stating that in late August or early September he had a fall in the upper recreation room.  *Defts' Ex.* 4A at page 81.  He indicated Michael Brown accused him of being doped up and of wanting to go to the hospital to get dope.  *Id.*  Griffis indicated he fell because he was dizzy and his leg was asleep.  *Id.*  When EMS arrived at the jail and asked if he wanted to go to the hospital he said he was fine.  *Id.*  Griffis asked if the staff was so poorly trained they could not take basic vital signs.  *Id.*  In response, Griffis was told explanations would be provided to his attorney and in court when his lawsuit was filed.  *Id.*

On September 29th, Griffis stated that day shift was supposed to change his dressing.  *Defts' Ex.* 4A at page 82.  He indicated it was the jail's responsibility to get bio-hazard bags.  *Id.*  He indicated that people at the jail were subject to coming into contact with his bodily fluids because of the way his dressings were mishandled.  *Id.*  He indicated a 10% bleach solution had been requested for the shower after he bathed but was not provided.  *Id.*  He also said his dressing had been changed in the food preparation area.  *Id.*  In response, his grievance was noted and he was told an explanation would be provided by the defendants' attorney when his lawsuit was filed.  *Id.*

On October 10th, Griffis submitted a grievance stating he had been talked to by Pete Moss about his having written a grievance on him for ignoring Griffis' request that he assess Griffis' leg injury. *Defts' Ex.* 4B at page 3. Griffis indicated he did not need a dressing change but instead was bleeding and needed medical attention. *Id.*

On October 11th, Moss wrote a response stating that he had been told on October 5th by inmate Hill that Griffis wanted his dressing changed. *Defts' Ex.* 4B at page 4. Moss advised Hill to tell Griffis that it was day shift's responsibility. *Id.* Moss talked to Griffis later but about other matters. *Id.*

On October 11th, Griffis submitted a medical request stating that he had a spider bite. *Defts' Ex.* 4B at page 6. In response, Griffis was taken to the emergency room and had the bite looked at and his left evaluated again. *Id.*

Griffis indicates he slept on the floor at the CCDC for about eleven months and during that time was bitten by spiders no less than three times. *Resp.* at ¶ 68(C). Griffis also indicates fellow inmates Jason Edwards and Raymond Mock were also bitten. *Id.*

Between October 28th and October 31st, Griffis wrote a number of grievances about Reely calling Dr. Farrow at OGC and claiming to have seen no difference in Griffis when he took his various prescription medications. *Defts' Ex.* 4B at pages 8 to 15.

On October 30th, Griffis submitted a grievance stating that on or about December 16, 2003, he was taken to St. Johns to have five sutures in his lip following a fall. *Defts' Ex.* 4B at page 21. He indicates he was to go back in five days to have the sutures removed but were not taken back and had to chew them off. *Id.*

Griffis was asked to explain why he waited more then ten months to ask to be taken back to the doctor for suture removal.  Griffis responded that he did not.  *Resp.* at ¶ 70(B).  Instead, he states he was still asking to go back.  *Id.*

On October 31st, Griffis complained of Pete Moss almost choking his air off in the restraint chair and of being ignored for six hours.  *Defts' Ex.* 4B at page 27.  He also stated that Jimmy Keeland left him unattended for five hours.  Griffis was asked to state:  (a) the date he was in the restraint chair: (b) how long he was in the restraint chair; (c) the reason he was in the restraint chair; (d) whether he was given breaks from the restraint chair to stretch his legs, use the restroom, etc.; and (e) if he was in the restraint chair on October 31st please explain how he was able to write the grievance.  *Resp.* at ¶ 71.  Griffis did not respond.  *Id.*

On November 3rd, Griffis submitted a medical request complaining of severe pain in his leg.  *Defts' Ex.* 4B at page 31.  He also complained of spasms in his spine.  *Id.*

In response, Griffis was told he had been treated at the emergency room but would be taken there again.  *Defts' Ex.* 4B at pages 31-32.  He was taken to the emergency room and treated.  *Id.*

On November 3rd, Griffis submitted a grievance about his dressing being changed on October 22nd, 23rd, and 24th in a food preparation area.  *Defts' Ex.* 4B at page 35.  Griffis was asked to explain how he believed this violated his federal constitutional rights.  He stated this subjected everyone in the jail to infection and disease.  *Resp.* at ¶ 73.  Further, he states he was entitled to privacy and a clean safe environment in which to conduct medical procedures.  *Id.*

On November 16th, Griffis submitted a grievance stating he had not been allowed to care for his leg for two days and had to re-use the old gauze one day.  *Defts' Ex.* 4B at pages 31-32.

-24-

He asserts a particular log entry shows jailer Brandon Lewis returned a used dressing for another use. *Resp.* at ¶ 74.

On November 24th, Griffis submitted a medical request stating he was having severe anxiety attacks and asking to see Nurse Howerton or Dr. Birk. *Defts' Ex.* 4B at page 44. In response, an appointment was made for Griffis to see Nurse Howerton. *Id.*

On November 29th, Griffis submitted a request stating the medication Nurse Howerton placed Griffis on, Bextra, had been pulled from the market because it had been found to cause heart problems. *Defts' Ex.* 4B at page 48. Griffis asked that his letter to her be faxed so that something could be done about the medicine situation. *Id.*

His letter was faxed the following day. *Defts' Ex.* 4B at page 48. Nurse Howerton replied that Bextra had not been taken off the market. *Id.* at page 50.

On December 14th, Griffis was given a bandage kit containing among other things a tube of triple antibiotic cream, a tube of cortisone cream, and a partial bottle of hibiclens. *Defts' Ex.* 2B at page 32. When Officer Lott picked up the kit he discovered all tubes were gone and the bottle of hibiclens was empty. *Id.* Lott discovered Griffis had emptied part of it into the trash bag. *Id.*

On December 15th, Nurse Howerton stated that if Griffis felt uncomfortable taking NSAIDs then she agreed he should quit taking Bextra. *Defts' Ex.* 3D at page 41. However, she stated she would not replace it with narcotic pain medication. *Id.* She indicated Griffis could take his Ultram. *Id.*

-25-

Nurse Howerton noted Griffis also repeatedly asked for Xanax and Soma. *Defts' Ex.* 3D at page 41. She noted that Valium functioned as both an anti-anxiety medication and a muscle relaxer. *Id.*

With respect to Griffis' Seroquel and Paxil, Nurse Howerton stated she had repeatedly told Griffis that she would increase it slowly. *Defts' Ex.* 3D at page 41. If that was not satisfactory with Griffis, she suggested that he consider an alternative health care provider. Id.

On December 19th, Griffis submitted a grievance stating that he and inmate Dale Vida Smith had been moved from J block to M block by Officer George Jeffries. *Defts' Ex.* 4B at pages 56-57. He indicated the cell he was placed in the back wall faced north and was so wet that anything touching it immediately became wet. *Id.* Griffis indicated his writing paper, pictures, and letters were warping from the moisture. *Id.* He also said there was mold growing from the ceiling to the floor. *Id.*

Griffis indicated there was not enough light in the cell to read a book, the sink did not work unless a tooth brush was jammed inside it, and the toilet did not flush unless you flushed it twenty or thirty times for five seconds at a time. *Defts' Ex.* 4B at page 56. Griffis also indicated the cell was so cold two or three blankets failed to keep him warm. *Id.* On December 18th, Griffis indicated he was denied his hour of recreation, a shower and clean clothes. *Defts' Ex.* 4B at page 57.

Griffis was asked to describe the M block cell he was confined in. He responded as follows:

> It has been to[o] long to recall. Some one and two man cells, one four man cell. Two picnic type tables and one single shower. There was a drinking fountain but no sink. There were no windows. It was always very, very cold. It was filthy,

-26-

in disrepair, the plumbing was always broke somewhere.  The walls froze in winter and ran water when it rained.  There were bugs, lice and mice.  Mold constantly grew in the shower.  We were locked down at least eighteen (18) hours a day in solid cells with no way to call for help–and we were <u>not</u> checked–the jail logs support this.

*Resp.* at ¶ 77(D).

On December 20th, Griffis' attorney sent Sheriff Medford a four page grievance Griffis had prepared and indicated he would like to hear Sheriff Medford's side of the story about Griffis and Vida Smith being placed into a wet cell.  *Defts' Ex.* 4B at page 60.

On December 20th, Griffis submitted a grievance complaining that he was brought insufficient medical supplies for his wound.  *Defts' Ex.* 4B at page 61.  Griffis stated there was no hibiclens and no triple antibiotic cream.  *Id.*

According to defendants, Griffis was placed on lock-down from December 17th until December 20th because he refused to move into his newly assigned cell because the wall was damp.  *Defts' Ex.* 4B at page 64.  Griffis states, he refused to moved into the newly assigned cell because water was running down the walls.  *Resp.* at ¶ 80(A).  Moreover, he notes that he never received a disciplinary notice or any type of a hearing.  *Id.*

On December 20th, Griffis was taken off lock-down but warned that further refusal to obey a jailer's orders would result in further lock-down.  *Defts' Ex.* 4B at page 64.  Griffis was offered recreation at that time.  *Id.*  He refused but Smith went to recreation.  *Id.*  On December 21st, defendants assert Griffis was moved to an interior cell that did not have a moisture problem.  *Id.*

On December 21st Griffis complained that he had no hibiclens.  *Defts' Ex.* 2B at page 34.  Lott told Griffis that was because he had wasted it but emptying it into the trash bag.  *Id.*

-27-

On December 21st, Nurse Howerton faxed Griffis a letter stating that Valium worked as a muscle relaxer. *Defts' Ex.* 3D at page 30. She indicated she would not prescribe Griffis both Valium and Soma. *Id.* She indicated that she did not need Griffis to fax her information regarding the side effects of medications. *Id.* If Griffis was frustrated with her, she stated he was free to choose another healthcare provider in the area. *Id.*

She stated she would not allow Griffis to dictate to her what medications she would prescribe to him. *Defts' Ex.* 3D at page 30. In her opinion, it would not be safe for her to prescribe the medications Griffis was seeking. *Id.*

On December 28th, Griffis was instructed to move from his cell in juvenile block to cell seven in male block. *Defts' Ex.* 2B at page 19. He refused to comply. *Id.* He had to be told several times and Sheriff Medford had to be summoned before he finally complied. *Id.*

On January 10, 2005, Griffis submitted a medical request complaining of chest wall pain. *Defts' Ex.* 4B at page 68. He stated it hurt to breathe. *Id.* His medical request was faxed to Nurse Howerton. *Id.*

On January 13th, Griffis stated he was in great discomfort and indicated in the past he had always been given Soma a muscle relaxer. *Defts' Ex.* 4B at page 69. Griffis' request was faxed to Nurse Howerton. *Id.* at page 70.

Howerton asked if Griffis could stay off his Valium while he took Soma. *Defts' Ex.* 4B at page 70. If so, she said she would call him in some. *Id.* Griffis replied that he had taken Valium for years and could not just quit. *Id.* He asked that she could ahead and make an appointment with the doctor. *Id.*

-28-

On January 19th, Griffis asked if he could take recreation upstairs or move back to J block. *Defts' Ex.* 4B at page 72. He indicated he was extremely nervous and scared "down there." *Id.* He indicated he was on medication for anxiety disorder, panic disorder, and clinical depression. *Id.*

In response, he was told he could not take recreation with J block. *Defts' Ex.* 4B at page 72. He was told he could take recreation with the other inmates or stay in his cell. *Id.* He was told he was on medication for his mental problems and if the medications were not working perhaps he needed to discuss that with his doctor. *Id.*

On February 3rd, Nurse Howerton noted that she had received a refill request for Griffis' Seroquel. *Defts' Ex.* 3D at page 42. She stated that she had called and checked to see if they needed to increase his dosage. *Id.* She was told that it was fine where it was at. *Id.* She increased Griffis' dosage to 175 mg. three times a day. *Id.*

With respect to the Paxil CR, Nurse Howerton noted that Griffis was on 625 mg., per day and that was the maximum recommended daily dosage. *Defts' Ex.* 3D at page 42. For that reason, she would not increase it. *Id.*

Finally, with respect to Griffis' leg, she stated she could not do anything without seeing it. *Defts' Ex.* 3D at page 42. She stated if Griffis needed to be seen to request an appointment. *Id.*

On March 8th, Griffis submitted a medical request. *Defts' Ex.* 4B at page 77. Griffis indicated he was having pain in his whole spine. *Id.* He asked to see an ortho doctor. *Id.*

Griffis' request was faxed to Nurse Howerton. *Defts' Ex.* 4B at page 77. On March 8th, 2005, Nurse Howerton suggested that Griffis see an orthopedist ASAP. *Defts' Ex.* 4C at page

-29-

1.  She was not sure why Griffis was having to beg to see an orthopedic MD she did not know if it was because of the MD's office or a problem with the facility.  *Id.*

Griffis was asked if it was a problem with the MD's office or the CCDC.  He did not respond to this question.  *Resp.* at ¶ 86(D).

On March 8th, Dr. Ricciardi, of the Orthopaedic & Sports Medicine Clinic of Northwest Arkansas, wrote to Griffis via his attorney to advise Griffis that he would not be writing any additional medications besides the Soma prescribed on January 18th and filled at Poynor Drug.  *Defts' Ex.* 3D at page 31.  Dr. Ricciardi did authorize the dispensing of a new prescription for 100 carisprodol 350 mg. tablets to be taken one four times a day as needed with the last dose to be taken at bedtime with one refill allowed.  *Id.*  He was not authorizing any more pain medication.  *Id.*  Dr. Ricciardi noted that the rib series and frontal chest film was unremarkable with no evidence of fracture, dislocation, or subluxation of the ribs.  *Id.*

On March 9th, Griffis again asked for an appointment with an orthopaedic doctor.  *Defts'* Ex. 4C at page 8.  Griffis also asked for a refill of his carisprodol.  *Id.*  He said he had been out for two days.  *Id.*

In response, Griffis was told the doctor had to okay a refill of the medication and the doctor had not yet okayed the refill.  *Defts' Ex.* 4C at page 8.  As soon as the doctor authorized it, Griffis was told it would be obtained.  *Id.*  He was also told an appointment was made with Dr. Ricciardi.  *Id.*

On March 10th, Nurse Howerton wrote that she did not do trigger point injections but noted that she understood Griffis had gotten another appointment with Dr. Ricciardi.  *Defts' Ex.*

-30-

4C at page 4.  Griffis was asked what treatment he received from Dr. Ricciardi.  Griffis did not respond to this question.  *Resp.* at ¶ 89(B).

On April 1st, during a shakedown of Griffis' cell, a plastic deodorant container was found containing various medication tablets and capsules was found hidden under his mattress.  *Defts' Ex.* 2B at page 38.  The medications were determined to be Griffis' prescription medications Tramadol, Seroquel, Carisprodol, Diazapam, and Benadryl.  *Id.*

Jailers were notified to give Griffis only his prescription medications and no over the counter medications.  *Defts' Ex.* 2B at page 39.  They were to provide Griffis  with water and watch him put the medication in his mouth and swallow the water.  *Id.*  Jailers were then to have him show them his empty mouth.  *Id.*

On April 7th, Nurse Howerton wrote that she did not feel comfortable with so many medications with similar effects.  *Defts' Ex.* 3D at page 32.  She indicated she wanted another doctor to see Griffis and attempt to discover a physical reason for his pain as she did not feel comfortable treating pain without an etiology she could document.  *Id.*

She indicated she did not get any new recommendations from the psych evaluation.  *Defts' Ex.* 3D at page 32.  At this point, she felt with Griffis' many medications he needed to find another primary care provider.  *Id.*  She stated that she felt a physician might be better able to respond to his emotional treatment as well as his pain management.  *Id.*  She stated she would provide emergency treatment for the next thirty days to allow Griffis to find alternate healthcare.  *Id.*

On April 28th, Griffis submitted a medical request about pain in his lower right tooth.

-31-

*Defts' Ex.* 4C at page 19.  In response, Griffis was told the dentist would not be there until Monday and a call would be made then.  *Id.*

On May 1st, Griffis submitted a request about his tooth and gum lines asking whether they had remembered to call the dentist.  *Defts' Ex.* 4(C).  He was told a call had been made.  *Id.*

On May 24th, Reely wrote Griffis regarding his medication refills.  *Defts' Ex.* 4C at page 21.  She stated she had received a call from Jim at Poyner Drug and was told by him that Shelia Howerton would no longer refill his medication and that she was no longer treating Griffis and had informed him of that fact.  *Id.*  Reely told Jim that Griffis had been treated by Dr. Malone.  *Id.*  Dr. Malone was contacted but refused to refill the medication.  *Id.*  Griffis was asked if there was another doctor in Carroll County they could call for him.  *Id.*  Griffis asked for Dr. Stensby's number but were told he was no longer in the phone book and was believed to have moved to Benton County.  *Defts' Ex.* 4C at page 22.

On June 10th, Griffis complained of chest pains radiating from the left side of chest and back.  *Defts' Ex.* 2B at page 36.  He was checked by Jailer Smith and Pete Moss.  *Id.*  His blood pressure was taken and it was 132/96.  *Id.*  The Emergency Medical Services unit from St. John's hospital was called to come and check Griffis.  *Id.*

The paramedic ran several tests but did not find anything wrong.  *Defts' Ex.* 2B at page 36.  Griffis stated he had a bad headache and was feeling nauseous.  *Id.*  He was told that he could either sign an against medical advice form or go to the hospital.  *Id.*  He was transported to the hospital.  *Id.*

Griffis was seen at the Rural Health Clinic on June 17th.  *Defts' Ex.* 3E at page 4.  Griffis had pain and edema below the ankle on his left leg.  *Id.*  He also complained of some discomfort

-32-

in his chest and some shortness of breath. *Id.* He was prescribed medication and told to elevate his leg. *Id.*

On July 4th, Griffis submitted a request stating he needed a glucometer and a blood pressure cuff that worked. *Defts' Ex.* 4C at page 33. Griffis was asked to explain why he needed a glucometer. He did not respond. *Resp.* at ¶ 96(B). He was also asked to explain what was wrong with the blood pressure cuff that was available for his use. He did not respond. *Resp.* at ¶ 96(C). Although he did indicate he took medication for high blood pressure and his doctor required him to keep track of his blood pressure. *Id.* at ¶ 96(D) & ¶ 96(E).

On July 20th, Griffis submitted a medical request asking to be taken to the doctor about his leg. *Defts' Ex.* 4C at page 46. He indicated he believed it was infected again. *Id.* He was taken to the emergency room about his leg. *Id.*

On July 22nd, Griffis asked to be taken to Dr. Justice again. *Defts' Ex.* 4C at page 51. In response, Griffis was told his attorney would need to obtain another order to allow him to go to see Dr. Justice in Jasper. *Id.*

On July 28th, Griffis submitted a request stating that he had a signed court order to see his own doctor and the doctor wanted to see Griffis in a couple of weeks. *Defts' Ex.* 4C at page 55. Griffis stated they were taking him to the hospital in Berryville instead of to Dr. Justice. *Id.*

Reely pointed out the order only covered the June 17th visit to Dr. Justice. *Defts' Ex.* 4C at page 55. She told Griffis that he would have to get another court order for subsequent visits. *Id.* With respect to the emergency room visit in Berryville, Reely noted that was for treatment of his leg infection. *Id.*

AO72A
(Rev. 8/82)

On July 13th, Griffis submitted a medical request stating that he had bone fragments moving in his lower right jaw causing him discomfort. *Defts' Ex.* 4C at page 62. In response, a dental appointment was made. *Id.*

On August 29th, Griffis was seen at the Rural Health Clinic for problems about his left leg and a migraine headache. *Defts' Ex.* 3E at page 5. On August 31st, Griffis submitted a medical request stating that Dr. Justice indicated he needed to see the dentist and that his problems with his teeth might be causing his headaches. *Defts' Ex.* 4C at page 64. In response, Griffis was told that Dr. Justice needed to tell the CCDC that is he wanted Griffis to see the dentist. *Id.*

On September 1st, Griffis submitted a grievance asking how he could brush his teeth without toothpaste. *Defts' Ex.* 4C at page 66. He also stated that Dr. Justice was not seeking a dental appointment. *Id.* He pointed out he was in their custody and it was their responsibility to see to his welfare. *Id.*

Griffis submitted a second request that same day in which he stated Dr. Justice did tell them about Griffis' teeth but through him. *Defts' Ex.* 4C at page 67. Griffis requested a dental appointment. *Id.* Griffis stated that he could not brush more than once a day, lacked proper nutrition, and had no sunlight for 2 ½ years. *Id.* Griffis indicated the toothbrush and tube of crest the dentist had given him had disappeared. *Id.* Griffis indicates the toothpaste was confiscated because the dentist did not write a prescription for it. *Resp.* at ¶ 103(B).

In response, Griffis was told he could brush his teeth as often as he would like. *Defts' Ex.* 4C at page 67. He was told he was provided a toothbrush and "toothpaste 1 x day." *Id.* He was also told that he had been to the dentist on July 14th and had been seen by the dentist eight

-34-

times since January of 2003. *Id.* Moreover, he was told Dr. Justice had provided no instructions to Reely or through his attorney to Reely. *Id.* Griffis also asserts that toothpaste was not always given every day. *Resp.* at ¶ 103(E).

On September 8th, Griffis asked if Dr. Justice could be called and asked to prescribe Phenergan suppositories. *Defts' Ex.* 4C at page 69. Griffis stated he had been vomiting all night. *Id.* Gentry reported that Griffis ate lunch and was out of his cell and not vomiting. *Id.*

On September 12th, Griffis requested that an appointment be made with a dentist. *Defts' Ex.* 4C at page 69. He stated his back tooth was black. *Id.* An appointment was made for the next day. *Id.* at 71.

On September 14th, Griffis submitted a grievance. *Defts' Ex.* 4C at page 72. He stated he had been complaining of a migraine since before the move from the old jail. *Id.* He stated he asked for a quieter cell. *Id.* He indicated he asked for his medicine for his headaches and was refused. *Id.*

In response, Griffis was asked what medication was not given him. *Defts' Ex.* 4C at page 72. He was also told he had been to the doctor since the move had been made to the new jail and he had been receiving all prescribed medication. *Id.*

Griffis then asked for the two sheets of papers the doctor sent back to the jail. *Defts' Ex.* 4C at page 74. He was given copies and told there were no notes on the sheets for the jail to follow. *Id.*

Griffis was asked what prescribed medication he did not receive. He was also asked who had prescribed the medication and when. Griffis did not answer these questions. *Resp.* at ¶

-35-

106(D).  Griffis was also asked what two sheets of paper he was referring to.  He did not respond.  *Id.* at ¶ 106(F).

On September 16th, Griffis submitted another request stating he still had the headache.  *Defts' Ex.* 4C at page 75.  He asked if one of the Harrison Clinic doctors would see him, or Dr. Lee, or the emergency clinic.  *Id.*  If not, he stated he would have to call Steve.  *Id.*

In response, Griffis was told that Reely could not arrange new doctors.  *Defts' Ex.* 4C at page 75.  She told Griffis that both she and his Mother had called all the doctors in the county.  *Id.*  She asked if Griffis wanted her to call Dr. Justice.  *Id.*  She also asked if Griffis told Steve he needed to go back to the doctor so he could get the order.  *Id.*  Griffis was asked whether the Steve he was referring to was Steve Vowell his attorney.  Griffis did not respond.  *Resp.* at ¶ 106(I).  On September 16th, Dr. Justice authorized a refill of Griffis' migraine medicine but not of the suppositories.  *Defts' Ex.* 4C at page 76.

On September 21st, Griffis submitted a request for medical attention because of edema in both of his feet.  *Defts' Ex.* 4C at page 79.  In response, he was taken to the emergency room for evaluation.  *Id.*

Griffis was to return the following day for venus doppler studies.  *Defts' Ex.* 3E at page 6.  His tramadol was to be stopped.  *Id.*

Griffis was asked if he had the study done.  He did not respond.  *Resp.* at ¶ 108(D).

On September 21st, Griffis refused his meal of rice with beef salad, cake, apple sauce, two slices of bread, and milk.  *Defts' Ex.* 2B at page 37.  He was asked to explain why he refused this meal.  Griffis did not explain.  *Resp.* at ¶ 127(B).

AO72A
(Rev. 8/82)

Griffis was asked whether he agreed, disagreed, or was without knowledge to agree or disagree with the following statement: "The meals you were served at the CCDC were sufficient to maintain your health." Griffis responded by indicating he was without knowledge to agree or disagree with this statement. *Resp.* at ¶ 127(C).

On September 22nd, central control was told to leave Griffis' cell door open because he needed to be able elevate his legs and still be able to hear the television during the day. *Defts' Ex.* 3D at page 38. On September 23rd, Griffis stated that one of his medications, Butal, was in an envelop marked: "A pod Griffis only if he asks for it (Don't ask him if he wants it)." *Defts' Ex.* 4C at page 80. Griffis stated it would be hard to ask for something if he didn't know he had it. *Id.* He stated he had not been given a copy of the doctor's orders although he had repeatedly asked for them at the old jail. *Id.*

In response, Griffis was told that since he had discussed his problems with his doctor in Jasper who had prescribed the medication and he was an LPN, they assumed he knew about the drug and its instructions. *Defts' Ex.* 4C at page 80. Additionally, it was noted Griffis was provided a copy of the doctor's orders on September 14th after he requested them. *Id.*

On October 13th, Griffis was told that due to his history of self mutilation he would be held in the observation room until he was transferred to the Arkansas Department of Correction (ADC). *Defts' Ex.* 4C at page 83. Griffis was told this was for his own safety. *Id.*

During his incarceration at the CCDC, according to defendants, Griffis mutilated himself with sharp objects on two occasions. *Defts' Ex.* 7 at page 11. On February 18, 2003, he stabbed himself in the stomach with a pencil. *Id.* On August 10, 2004, Griffis cut his leg. *Id.* He cut it with a blade from a razor. *Id.*

-37-

Both injuries required Griffis to be taken to the emergency room for treatment. *Defts'*
*Ex.* 7 at page 11. After these injuries, Griffis was placed on suicide watch temporarily. *Defts'*
*Ex.* 7 at page 11; *Defts' Ex.* 2A at page 59; *Defts' Ex.* 2B at pages 1-11. Following the cut on
Griffis' leg, defendants maintains Griffis purposefully did not follow doctor's orders and tore
the bandage off that had been applied at the hospital, refused to elevate his leg, and tried to
remove the stitches. *Defts' Ex.* 7 at page 11; *Defts' Ex.* 2B at page 15.

Defendants maintain that Griffis was transported from the hospital, as officers left the
room where he was housed, Griffis told Officer Keeland: "Thank you for taking off my
bandage." However, the bandage was still on Griffis when the officers left the room. *Defts' Ex.*
2B at page 15. Griffis removed the bandage himself almost immediately after the officers left
the room. *Id.*

Griffis complained to his attorney, Stevan Vowell, that he was not being cared from
properly. Defendants assert Vowell was shown the video tape of Griffis removing the bandages
that jail staff had provided according to the doctor's orders. *Defts' Ex.* 7 at page 11. Defendants
maintain Vowell was sent regular correspondence detailing the care Griffis was receiving.
According to defendants, because of Griffis' actions in trying to remove the stitches and because
he had injured himself, he was placed on a suicide watch in a restraint chair to keep him from
causing further injury to himself or others.

With respect to his claim about being confined to the restraint chair, Griffis was asked
to state: (a) the name of each defendant he claims was responsible for confining him to the
restraint chair; (b) the date or dates on which he was confined to the restraint chair; (c) the length
of time he was confined to the chair on each occasion; (d) whether he was released for short

periods to stretch his legs, use the restroom or any other reason during his period of confinement; and (e) the reason he confined.  Griffis responded:  "I believe I did "mention" [being confined to the restraint chair], but only in passing I think."  *Resp.* at ¶ 131(A).

## II.  Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III.  Discussion

Defendants have now moved for summary judgment on each of plaintiff's claims.  We will address each of defendants' arguments in turn.

### *Official and Individual Capacity Claims*

-39-

First, defendants contend plaintiff has asserted only official capacity claims against them. As there is no proof that plaintiff's constitutional rights have been violated pursuant to a custom or policy of Carroll County, they contend they are entitled to summary judgment.

We reject this argument. We believe defendants were on clear notice that plaintiff was asserting individual capacity claims in this case. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989)(plaintiffs advised to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability). Griffis filed a motion to amend his complaint on March 16, 2006 (Doc. 17). Among other things, the allegations of the amended complaint prayed for damages against the defendants in their personal capacity. The motion to amend the complaint was granted by order entered on June 20, 2006 (Doc. 22).

### Denial of Adequate Medical Care

With respect to Griffis' claim that he was denied adequate medical care, defendants contend that he had no serious medical needs. Instead, they assert he merely suffered from various maladies none of which constitute a serious medical need. Even if one or more of these maladies constitute a serious medical need, they maintain he was provided with adequate medical care.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth

-40-

Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007).  In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care.  *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting  Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).  *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992).  "A medical need is serious if it is obvious to the layperson or supported by

-41-

medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

We reject the argument that Griffis had no serious medical needs.  On at least one occasion he had a laceration that needed suturing.  He also had an injury to his abdomen that required a visit to the emergency room and an injury to his leg that required multiple visits to the emergency room.  Furthermore, Griffis suffered from migraine headaches, a herniated disc, and had dental needs that defendants maintain resulted in them sending him to the dentist at least eight times during his incarceration at the CCDC.  *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)("Dental conditions, like other medical conditions, may be of varying severity."). We believe Griffis had serious medical needs.

We do, however, agree defendants are entitled to summary judgment on the grounds that there are no genuine issues of material fact as to whether they exhibited deliberate indifference to his serious medical needs.  First, defendants arranged for Griffis to be treated by a variety of medical personnel on multiple occasions.  Griffis was treated at the emergency room of the hospital, by Nurse Howerton, Dr. Justice, Dr. Malone, Dr. Ricciardi (an orthopedic doctor), Dr. Clay (a psychiatrist), and treated by paramedics and/or emergency responders.  Griffis was also taken to a dentist on multiple occasions during his incarceration.  Many times appointments were obtained for him within a day or two of his request for medical treatment.  The records indicate defendants responded to Griffis' requests for medical attention, arranged for him to see various medical personnel, and attempted to meet Griffis' medical needs.  *See Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001)(multiple contacts with medical personnel do not necessarily preclude a finding of deliberate indifference but are considered).

-42-

Griffis also asserts that his medication was on occasion allowed to run out or was not re-filled promptly.  Similarly, he contends he did not always have everything necessary to dress the wound in his leg.  We believe this establishes at most negligence on the part of one or more of the defendants.  *See e.g., Mayweather v. Foti*, 958 F.2d 91, 91-92 (5th Cir. 1992)(an occasional missed dose of medication was a minimal deficiency that fell far short of establishing deliberate indifference); *Williams v. Cearlock*, 993 F. Supp. 1192, 1197 (C.D. Ill. 1998)("The defendants' failure to provide the plaintiff with his medicine on occasion amounted, at worse, to negligence.").  Similarly, Griffis was provided with adequate supplies to change the dressing on his leg wound.  There is no indication the hospital ordered defendants to provide each item demanded by Griffis or that it directed the disposal of the dressing material in the manner suggested by Griffis.  Rather, this is merely a requirement Griffis maintains would have made the disposal safer for all involved.  While it may have been a better method of disposal, this does not mean defendants acted with deliberate indifference to Griffis' serious medical needs merely because they did not follow his suggestion.

Second, "[w]hen the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment.  To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment ..."  *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(internal quotation marks and citations omitted).  Griffis has placed no medical evidence in the record establishing the detrimental effect of any delay in medical treatment.

-43-

*Conditions of Confinement*

With respect to Griffis' claim regarding the conditions of his confinement, defendants contend Griffis can offer no evidence that the meals he was served were nutritionally inadequate to preserve his health or were served in a manner presenting an immediate danger to his health or that his health suffered as a result of the diet he received. With respect to general conditions, defendants contend there is no evidence Griffis was deprived of a single identifiable human need such as food, warmth, or exercise.

The Court of Appeals for the Eighth Circuit has adopted the same legal standard for detainees that applies to convicted inmates, thus the date of Griffis' conviction becomes irrelevant for purposes of determining whether defendants are entitled to summary judgment on this issue. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006)(adopting the Eighth Amendment's deliberate indifference standard as the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII.

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions

-44-

that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Griffis first contends his rights were violated by the conditions under which he was confined at the CCDC. Griffis complains about the following conditions: the cells were filthy and there were gnats, flies, spiders and mice, *resp.* at ¶ 9(B); he was bitten by a spider, *resp.* at ¶ 9(B); the pre-shower room needed a drain to avoid bacterial growth, *resp.* at ¶ 9(D); dozens of meals were not served, food was withheld, bologna sandwiches were put in a blender, and expired food served, *resp.* at ¶ 9(E); there was only one set of hair clippers that was not cleaned

AO72A
(Rev. 8/82)

between uses, *resp.* at ¶ 9(F); no access to law library material, *resp.* at ¶ 9(G); no medical staff; and no jailers with medical training, *resp.* at ¶ 9(H).

Inmates were responsible for cleaning their own cells. *Resp.* at ¶ 53(B). Cleaning supplies were brought around to each cell at about 8:00 a.m. each morning, Monday through Friday, but sometimes not at all. *Id.* Breakfast and dinner were served in the cells. *Id.* Volunteers were responsible for cleaning the common areas of the jail. *Id.* at ¶ 53(C).

From December 19, 2004, until December 21, 2004, Griffis was confined to an M block cell in which he asserts the back wall faced north and the wall was so wet everything touching it immediately became wet. *Resp.* at ¶ 77(A); ¶ 80(C). Griffis indicated his writing paper, pictures, and letters were warping from moisture. *Id.* He also said there was mold growing from the ceiling to the floor. *Id.*

Griffis states there was not enough light in the cell to read, the sink only worked if a toothbrush was jammed in it, the toilet didn't flushed unless it was flushed twenty or thirty times for five seconds each time, and the cell was so cold that two or three blankets failed to keep him warm. *Resp.* at ¶ 77(B). On December 18th, Griffis maintains he was denied his hour out, a shower, and clean clothes. *Id.* at ¶ 77(C). On December 20th, defendants' records indicate Griffis was offered but refused recreation. *Defts' Ex.* 4B at page 64.

The Supreme Court has stated that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 305, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). However, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing

-46-

effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise–for example, a low cell temperature at night combined with a failure to issue blankets." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)(*citing Wilson*, 501 U.S. at 304). The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The Eighth Circuit has noted that conditions, "such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months." *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994)(internal quotation marks and citation omitted). The court considered both the length of time a prisoner must endure the filthiness and the level of filthiness. *Id.* In this case, Griffis had access to cleaning supplies, although not as frequently as he would have liked, he had access to clothing, showers, a toothbrush, toothpaste, blankets, medical care, food, prescription medication, writing supplies, and was allowed to exercise. His confinement to the cell in M block with the moisture problem or water problem was limited in time to only a few days during which he had access to two or three blankets in an effort to keep warm. We do not believe these conditions in combinations, or alone, create a genuine issue of fact as to whether the defendants violated the Eighth Amendment. In short, we do not believe there is a genuine issue of fact as to whether Griffis was deprived of a single, identifiable human need such as food, warmth, or exercise. *See e.g., Tokar v. Armontrout*, 97 F.3d 1078, 1082 (8th Cir. 1996).

Next, Griffis contends his rights were violated by the diet he received at the CCDC. Griffis maintains the jail records establish meals were not served on a variety of dates. For instance, he states the jail logs establish that there was no breakfast service on March 5, 2003.

-47-

However, the jail log submitted by plaintiff contains an entry for 0530 on March 3, 2005, that says: "fed all inmates."  The entry for 0545 says:  "picked up trays."

He next asserts, no dinner was served on March 12, 2003.  However, Griffis does not provide the court with the jail log for that date.  Instead, he provides the court with a documents entitled "meals served" and dated March 12, 2003.  This document does contain information only about the breakfast and lunch meal on the date in question.  The court is provided with no information regarding this document, whether it is kept every day, whether it is kept for all meals each day, etc.

Griffis next asserts there was no lunch service on March 14, 2003.  He provides the court with two separate documents dealing with this date.  Once is a copy of the jail log and the other is a document entitled meals served.  The jail log indicates lunch was served at 1130.  The meals served document contains no information regarding lunch.

The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health.  *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet). Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Eighth Amendment.  Rather, the Eighth Amendment is only violated if the food provided is inadequate to maintain good health.  *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of food).

"The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'" *Talib v. Gilley*, 138 F.3d 211, 214

-48-

n. 3 (5th Cir. 1998)(expressing doubt that Talib who missed about fifty meals in five months and lost fifteen pounds met this threshold)(*quoting Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)).  "Whether the deprivation of food falls below this threshold depends on the amount and duration of the deprivation." *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986).

In this case, Griffis has failed to show a genuine issue of material fact exists as to whether his constitutional rights were violated by the diet he was provided while at the CCDC.  Griffis contends there were often days the inmates only received two meals and when he was confined to the restraint chair his meals were blended.   He also denies generally that the diet was adequate.  However, Griffis has provided nothing other than his vague allegations suggesting that the meals were nutritionally inadequate.

There is no indication his health suffered from the diet he received.  *See e.g., Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)("no evidence that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food."); *Brown-El v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992)(claim that constitutional rights were violated when he was served cold food was frivolous).  Nor does the mere fact that Griffis may have on certain occasions received less than three meals a day state a claim of constitutional dimension.  *See e.g., Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986)(even on a regular permanent basis, two meals a day may be adequate). *See also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999)(claim that inmate missed eight meals properly dismissed as frivolous); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir.

1982)(Eighth Amendment not violated when inmate served only one meal a day for fifteen consecutive days where the one meal was sufficient to maintain normal health).

### Due Process

With respect to the use of the restraint chair, defendants note that in correspondence to the Carroll County Judge, Griffis stated he was in the chair for 168 hours. In pleadings to this court, defendants note Griffis has said he was in the chair for more than 300 hours. Defendants deny Griffis was restrained for such a period of time. However, they maintain the legal issue is whether the use of the restraints in a given situation is penologically justified.

Given plaintiff's history of self-inflicted wounds, having given his medication to others, and a history of being a security risk, defendants maintain that a determination that he was a threat to himself or the security of the facility was not unfounded. Defendants maintain they are entitled to wide ranging deference in the day to day operation of the detention facility. Defendants provide no further information with regard to when Griffis was in the restraint chair or otherwise disciplined.

It is not clear from the summary judgment record, when Griffis went from pretrial status to convicted status. "[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg v. Romeo*, 457 U.S. 307, 316, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). "The interest survives a criminal conviction and incarceration, pretrial detention, or involuntary civil commitment. Of course, a detainee's liberty interest in freedom from restraint is highly qualified and must be balanced against the state's reasons for restraining that liberty." *Benjamin v. Fraser*, 264 F.3d 175, 188 (2nd Cir. 2001)(citations omitted).

-50-

The law is clear that a pretrial detainee cannot be punished.  *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).  "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense."  *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).  *See also May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000)("The Due Process Clause of the Fourteenth Amendment prohibits the use of bodily restraints in a manner that served to punish a pre-trial detainee.").

"Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention."  *Bell*, 441 U.S. at 537.   In determining whether a particular restriction constitutes a permissible restriction or amounts to impermissible punishment, the court first asks "whether the restriction is based upon an express intent to inflict punishment."  *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002)(citations omitted).  If "there is no indication of such an express intent," the court next considers "whether punitive intent can be inferred from the nature of the restriction."  *Valdez*, 302 F.3d at 1045.

In this regard, the Supreme Court in *Bell* held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"  *Bell*, 441 U.S. at 539.  "An action may be reasonably related to a legitimate governmental purpose if an alternative purpose to which the act may rationally be connected is assignable for it and the action does not appear excessive in relation to the alternative purpose assigned."  *Robles v. Prince George's County, Maryland*, 302 F.3d 262, 269 (4th Cir. 2002)(internal citations and punctuation omitted).

-51-

> A reasonable relationship between the governmental interest and the challenged restriction does not require an "exact fit," nor does it require showing a "least restrictive alternative." Otherwise, every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Moreover, it does not matter whether we agree with the defendants or whether the policy in fact advances the jail's legitimate interests. The only question that we must answer is whether the defendants' judgment was rational, that is, whether the defendants might reasonably have thought that the policy would advance its interests.

*Valdez*, 302 F.3d at 1046.

"Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees." *Terry v. Hill*, 232 F. Supp. 2d 934, 943 (E.D. Ark. 2002). However, "[c]ourts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Id.* (citations omitted). Furthermore, there is a *de minimis* level of imposition with which the Constitution is not concerned." *Smith*, 87 F.3d at 268.

In this case, we believe genuine issues of fact preclude summary judgment in defendants' favor on this claim. From the record, it appears plaintiff was put on lock-down on at least two occasions without any type of disciplinary notice or hearing. *Defts' Ex.* 4B at page 64; *Resp.* at ¶ 80(A)(lock-down for refusing to move into a cell); *Defts' Ex.* 4A at page 53; *Resp.* at ¶ 46(B) (lock-down for contraband in cell). In general, a detainee has a right to be heard when charged with a disciplinary violation. *Wolff v. McDonnell*, 418 U.S. 539, 555-58, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).

-52-

Similarly, while defendants maintain they had legitimate penological reasons for placing Griffis in the restraint chair, they provide the court with no more than this blanket statement. In fact, defendants provided the court with no information on how many times Griffis was placed in the chair, the reasons he was placed in the chair in each instance, who made the decision on each occasion, how long he remained in the chair on each occasion, etc. Instead, it appears the defendants believe the court can give blind deference to their statement that based on Griffis' "history within the facility, the justification for placing him in restraints for a certain period of time to protect him from himself and to protect the other inmates and the security of the facility was not unfounded." *Defendants' Brief* (Doc. 90) at page 16.

### *Claims Against Jack Gentry, George Jeffries, and Mark Lotta*

Griffis was asked to describe how each of the defendants violated his constitutional rights. With respect to Jack Gentry, George Jeffries, and Mark Lotta, Griffis did not respond. *Resp.* at ¶¶ 132(F), 132(G) & 132(H). These defendants are therefore entitled to summary judgment.

## IV. Conclusion

For the reasons stated, I recommend the Carroll County Defendants motion for summary judgment (Doc. 89) be granted in part and denied in part. Specifically, I recommend the motion be granted with respect to plaintiff's claims that he was subjected to unconstitutional conditions of confinement and that he was denied medical care. I further recommend that all claims against Jack Gentry, Mark Lotta, Shelia M. Howerton, and Regina Fox Jeffrey (who was substituted as a defendant for George Jeffries) be dismissed. Finally, I recommend that the summary judgment motion be denied with respect to plaintiff's claim that he was denied due process when he was

-53-

placed on lock-down and placed in an "emergency response chair" or restraint chair.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **31st day of August 2007.**

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)